UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------

WILLIAM KLONER and ELIZABETH KLONER,

                        Plaintiffs,           **MEMORANDUM & ORDER**
                                               13-CV-3171 (MKB)

          v.

THE UNITED STATES OF AMERICA,

                        Defendant.

--------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiffs Rabbi William Kloner and his wife, Elizabeth Kloner, commenced this action on June 3, 2013 against Defendant the United States of America, alleging negligence in violation of the Federal Tort Claims Act (the "FTCA"). (Compl., Docket Entry No. 1.) On December 4, 2015, Defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Def. Mot. for Summ. J ("Def. Mot.")., Docket Entry No. 29; Def. Mem. of Law in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 30; Def. Reply Mem. of Law in Further Support ("Def. Reply"), Docket Entry No. 39.) For the reasons set forth below, the Court denies Defendant's motion for summary judgment.

## I. Background

      Plaintiffs seek damages for injuries they sustained as a result of Rabbi Kloner's fall from a staircase during a United States Coast Guard ("USCG") retirement ceremony. (Pl. Mem. in Opp'n to Def. Mot. ("Pl. Mem.") 5, Docket Entry No. 33.) The USCG retirement ceremony took place on June 24, 2010, in the music hall of the Snug Harbor Cultural Center and Botanical Garden ("Snug Harbor"), a privately owned space in Staten Island. (Compl. ¶ 14.)

### a. Arrangements leading up to the USCG ceremony

On February 18, 2010, the USCG and Snug Harbor entered into a rental agreement that permitted the USCG to use the music hall during its upcoming New York Change of Command and Retirement Ceremony.[1] (Def. Statement of Undisputed Facts Pursuant to Local R. 56.1 ("Def. 56.1") ¶ 1, Docket Entry No. 31.) The rental agreement stated that the USCG was barred from making "[a]ny alterations and/or attachments to the floors, wall or stages," (*id.* ¶ 6), and further stated that "[a]ll uses of [Snug Harbor's] facilities, equipment (regardless of ownership), and all procedural aspects of the program are subject to the supervision, rules, regulations, policies and procedures of [Snug Harbor], which has the exclusive right to determine what shall constitute a proper and safe conduct and use of its facilities," (*id.* ¶ 7). Elsewhere, the rental agreement explicitly permitted temporary alterations in connection with, for instance, weddings at the venue. (Snug Harbor Facility Agreement ¶ 19, annexed to Decl. of Joseph A. Marutollo ("Marutollo Decl.") as Ex. A, Docket Entry No. 32.)

Commander Carissa April, the head of planning and primary point of contact for the USCG event, made "four or five visits" to the Snug Harbor Music Hall while planning and preparing for the retirement ceremony. (Statement of Carissa April ("April Statement") 1, annexed to Decl. of Steven S. Honigman ("Honigman Decl.") as Ex. E, Docket Entry No. 37.)[2] The day before the ceremony, the USCG held a "full rehearsal" at the Music Hall with all

---

[1] The facts are undisputed unless otherwise noted. The Court will refer to Plaintiff's responses to Defendant's 56.1 and Plaintiff's statement of additional facts as "Pl. 56.1"; to Defendant's 56.1 and Defendant's responses to Pl. 56.1 as "Def. 56.1"; and to Defendant's further replies to Plaintiff's responses as "Def. Reply 56.1."

[2] Plaintiffs' exhibits A–J, annexed to the Declaration of Steven S. Honigman, are grouped and docketed as Docket Entries No. 35–38. The Court cites to the docket entry for each exhibit referenced.

ceremony participants except Rabbi Kloner and the other clergy member participant, Monsignor Dorney. (*Id.*) During the rehearsal, members of the ceremony's "Official Party" were escorted to the stage by ushers, in part because of the bridge-like structure of the staircase that crossed over the musician's pit. (Statement of Kenneth Schnetzler ("Schnetzler Statement"), annexed to Honigman Decl. as Ex. H.) Commander April and her colleagues decided to provide the clergy with an unofficial escort, "New York Sector VIP Coordinator" Ydania Matos, "as a measure of safety and comfort" at the event. (Dep. of Carissa April ("April Dep.") 75:2–14, annexed to Honigman Decl. as Ex. C, Docket Entry No. 36.) According to Commander April, "[the clergy's] path to the stage [via the main staircase] was assumed," (*Id.* at 45:18–19), because they had Matos as an escort and because, as more informal members of the ceremony, they would be seated on the stage before the ceremony began, (*id.* at 45).

The main staircase was configured as a stand-alone unit without hand rails, and it ascended over an orchestra pit and onto the theater stage. (Def. 56.1 ¶ 12.) The stair structure consisted of two three-riser staircases to the left and right sides of a platform, leading to a platform landing. (Sector New York Admin. Investig. ("USCG Investigation") 4, annexed to Compl. as Ex. F.)[3] That landing, approximately four feet wide, then turned toward the stage. (*Id.* at 12.) The next stair led to another platform that appeared to cross the majority of the orchestra pit, and the final stair was steeper than the platform step before it. (*Id.* at 4; Pl. Reply 56.1 ¶ 11.) The final stair also had a walking surface with a five-inch "lip" or drop-off, which required a person to step down onto the stage floor. (USCG Investigation 6, 8.)

As depicted in photographs later taken by a USCG investigating officer, and as noted by

---

[3] Plaintiffs' Exhibit F, the USCG Investigation, is paginated by hand and annexed to the Complaint as four documents. (*See* Docket Entry No. 1.) The Court refers to the hand-written page numbers on each page of Exhibit F.

Commander April and by Plaintiffs' expert in the expert's report, two other sets of enclosed staircases, behind doors, also led from the floor to the left and right sides of the stage. (*See* USCG Investigation 2; April Statement 1 ("How [the clergy] would get to the stage was not discussed, but they could (and in hindsight should) have used the side staircase access to the back/offstage wings . . . ."); Architect's Report on the Rabbi William Kloner's Fall ("Pl. Expert Report") 6, annexed to Honigman Decl. as Ex. B, Docket Entry No. 35.) Both Matos and the USCG's four-person Color Guard used the side stairs leading backstage at points throughout the ceremony. (Dep. of Ydania Matos ("Matos Dep.") 53:21–24; 56:14–21, annexed to Honigman Dep. as Ex. A, Docket Entry No. 35; April Statement 1.) Snug Harbor officials had assured the USCG that the main stage staircase was "safe to use" and that it had "always been used without incident" despite the absence of protective guardrails. (Def. 56.1 ¶¶ 13–14.)

   **b. Operational risk management procedures**

   Since at least 1999, the USCG has adhered to a standardized set of instructions known as Operational Risk Management ("ORM") procedures. (*See* Commandant Instruction 3500.3 ("ORM Procedures"), annexed to Honigman Decl. as Ex. F.) The procedures comprise a policy of continuously assessing and managing risks, which policy applies to "every command level and every person" during "[a]ll Coast Guard missions and daily activities, both on- and off-duty." (*Id.* at CG 51.)[4] In general, personnel are instructed to evaluate risk based on severity, probability and exposure, and to employ decision-making principles in executing jobs that contain any amount of risk. (*Id.* at CG 53–55.) Such decision-making principles include "identify[ing] options" by asking "[w]hat options can eliminate unacceptable risk? What options

---

[4] The ORM Procedures include several separately paginated attachments. The Court refers to pages by their Bates stamps, which begin with "CG."

reduce undesirable risk? . . . What new options should we consider?" (*Id.* at CG 61.)

Commander April performed an ORM assessment before the USCG retirement ceremony on

June 24, 2010. (April Dep. 31:4–19.) Commander April stated that "[o]perational risk

management is part of [the USCG] culture in everything we do. Every day we are performing

risk management, operational or otherwise." (*Id.* at 30:15–18.)

> c. **The June 24, 2010 incident**

At the time of the UCSG retirement ceremony, Rabbi Kloner was an 82-year-old retired

Rear Admiral of the New York Naval Militia. (Def. 56.1 ¶ 8; Pl. Statement of Undisputed Facts

Pursuant to Local R. 56.1 ("Pl. 56.1") ¶ 8, Docket Entry No. 34.) The Rabbi also "provid[ed]

Jewish Worship Service" pursuant to a civilian contract with USCG, for which he was paid an

annual salary of $9,999.96.[5] (Def. 56.1 ¶ 9.) The USCG asked Rabbi Kloner to offer an

invocation at the retirement ceremony because of his contract with USCG and because he was a

personal and professional friend of the retiring captain who was being celebrated that day. (Def.

56.1 ¶ 21; Compl. ¶ 15.)

On the day of the ceremony, Rabbi Kloner wore his service Dress White "choker"

uniform to Snug Harbor. (Def. 56.1 ¶ 10.) Commander April had never met the Rabbi and was

not aware of his age or his retired military status. (April Statement 1.) The Rabbi was greeted

by Matos, who escorted him to the wooden staircase in front of the stage, (Def. 56.1 ¶ 11), and

accompanied him up the staircase and on to the stage, (*id.* ¶ 15). There, Matos showed Rabbi

---

[5] The parties dispute the scope of Rabbi Kloner's duties under the operative contract between the parties in 2010. (Pl. 56.1 ¶ 32; Def. Reply 56.1 ¶ 32.) Plaintiffs annexed a "representative" contract to the Complaint, (Compl. ¶ 14), which was effective from October 1, 2007 through September 30, 2008 and is vague about whether Rabbi Kloner was contractually obligated to provide services beyond "weekly services on Wednesdays." (*See* Solicitation/Contract/Order for Commercial Items ("Commercial Contract"), annexed to Compl. as Ex. E, Docket Entry No. 1.)

Kloner his seat and podium assignment for the ceremony. (*Id.* ¶ 16.) Rabbi Kloner then expressed a desire to descend the stage staircase to the ground floor in order to meet with acquaintances in the audience before the start of the ceremony. (*Id.* ¶ 17.) Matos escorted Rabbi Kloner down the stage staircase and left him on the ground floor while she attended to official duties at the VIP check-in table. (*Id.* ¶ 18.) Matos testified during her deposition that she had informed Rabbi Kloner that she would "come and get [him] when it's time to start," (Matos Dep. 24:13–18), and that he "acknowledged" her statement by nodding,[6] (*id.* 24:19–25:6).

Shortly thereafter, the Master of Ceremony ("MC") proceeded to the main stage to announce the "officer's call," requesting that all standing guests take their seats. (*Id.* ¶ 19.) Rabbi Kloner made his way to the stage staircase and began to ascend on his own, as Matos helped the just-arrived Monsignor to his seat on the stage. (*Id.* ¶ 26.) As the Rabbi approached the final step near the top of the staircase, he lost his balance and fell to his left, into the open-air orchestra pit. (*Id.* ¶ 28.) He fell six and a half feet to the bottom of the pit. (*Id.* ¶ 29.) Two USCG medical officers and Sector New York medical staff provided emergency medical services to the Rabbi "within seconds of the fall." (USCG Investigation 15.) Police and emergency medical service technicians arrived approximately fifteen minutes later, and within minutes of one another. (*Id.*) Rabbi Kloner was transported to a waiting ambulance approximately eighteen minutes after his fall. (*Id.*)

### d. **Rabbi Kloner's medical condition**

Rabbi Kloner suffered severe injury from his fall, including acute intracranial hemorrhaging and multiple rib fractures and lacerations. (Compl. ¶ 21.) He remained comatose

---

[6] Plaintiffs dispute Matos' account, noting that, when she gave a statement to the Coast Guard Investigating Officer four days after Rabbi Kloner's fall, she did not report her instruction to Rabbi Kloner. (*See* Pl. 56.1 ¶ 25 (citing Matos Dep. at 24–25).)

and dependent on a respirator for several weeks after the accident and underwent a course of neurosurgical management and treatment for several months thereafter. (*Id.*) After undergoing treatment at multiple health and rehabilitation centers, Rabbi Kloner was transferred to the Cobble Hill Health Center. (*Id.*) There, he received speech-language, occupational and physical therapy until February 13, 2013, when he was transferred to his home. (*Id.*) After a year and a half of treatment at the Cobble Hill Health Center, Rabbi Kloner was still unable to initiate or carry on a conversation. (*Id.* ¶ 22.) At home, the Rabbi requires twenty-four-hour nursing care and cannot perform basic activities of daily life without aid from several caretakers. (*Id.* ¶ 25.)

Mrs. Kloner incurred medical and other expenses for Rabbi Kloner's treatment, loss of employment opportunity while she cared for her husband, and loss of consortium. (Compl. ¶¶ 42–55.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 230 (2d Cir. 2015); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the

jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. *Feres* doctrine

Defendant argues that the Court lacks jurisdiction over Plaintiffs' claim under the *Feres* doctrine, which carves out an exception to federal government liability under the FTCA. (Def. Mem. 21 (citing *Feres v. United States*, 340 U.S. 135, 146 (1950).)

The United States is generally immune from suit. *See United States v. Bormes*, 568 U.S. ---, ---, 133 S. Ct. 12, 16 (2012) ("Sovereign immunity shields the United States from suit absent a consent to be sued that is 'unequivocally expressed.'" (quoting *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33–34 (1992))). Under the FTCA, "Congress waived the United States' sovereign immunity for claims arising out of torts committed by federal employees while acting within the scope of their employment." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217–18 (2008); *Kuhner v. Montauk Post Office*, No. 12-CV-2318, 2013 WL 1343653, at *2 (E.D.N.Y. Apr. 4, 2013); *Leogrande v. New York*, No. 08-CV-3088, 2013 WL 1283392, at * 13 (E.D.N.Y. Mar. 29, 2013); *Espinoza v. Zenk*, No. 10-CV-427, 2013 WL 1232208, at *4 (E.D.N.Y. Mar. 27, 2013). The FTCA's waiver is subject to several exceptions, one of which bars recovery against the United States for injuries that "arise out of or are in the course of activity incident to [military] service." *Feres*, 340 U.S. at 146.

Prior to the development of the *Feres* doctrine, the Supreme Court held that the FTCA waived federal government immunity for suits brought by members of the armed forces "for

injuries not incident to their service." *Brooks v. United States*, 337 U.S. 49, 50–52 (1949). In *Brooks*, the plaintiff, his brother and their father were driving their car along a North Carolina highway when an Army-owned and -operated truck, driven by a civilian employee of the Army, collided with them. *Id.* at 50. Although the truck driver was found negligent, the government argued that because the plaintiff and his deceased brother were in the armed forces at the time of the accident, they were barred from recovery. *Id.* In its decision, the Supreme Court emphasized that the plaintiff and his brother were furloughed at the time of their accident, and that the Court was "dealing with an accident which had nothing to do with the Brooks' army careers, injuries not caused by their service except in the sense that all human events depend upon what has already transpired." *Id.* at 52. The Court reserved for a later decision the "wholly different case" of whether immunity would be waived had the accident occurred incident to the plaintiff's military service. *Id.*

In *Feres*, the Court addressed that "wholly different case," *see Feres*, 340 U.S. at 138, when it examined three related actions brought by claimants who, "while on active duty and not on furlough, sustained injury due to the negligence of others in the armed forces." *Id.* The Court in *Feres* noted that the *Brooks* plaintiff, by contrast, was "on furlough, driving along the highway, under compulsion of no orders or duty and on no military mission" when the government vehicle collided with him. *Feres*, 340 U.S. at 146. The "vital distinction," wrote the Court, was that the *Brooks* plaintiff's "relationship while on leave was not analogous to that of a soldier injured while performing duties under orders." *Id.*

The *Feres* doctrine "is best understood as an attempt to preclude suits by service members against the government because, as military *employees*, they received government disability and death benefits — benefits that [the Supreme Court] observed were similar to (and

if anything more generous than) most civilian workers' compensation awards." *Taber v. Maine*, 67 F.3d 1029, 1038 (2d Cir. 1995) (citing *Feres*, 340 U.S. at 145). The Second Circuit has stated that the *Feres* doctrine has "lurched toward incoherence" since its inception, *Taber*, 67 F.3d at 1039, but instructs courts to wade through the thicket by respecting "(1) the Supreme Court's stated concern for keeping courts away from delicate questions involving military discipline; (2) *Feres*'s clear intention to replace the contingencies of local tort law with a uniform federal scheme; and (3) *Feres*'s original desire that this uniformity is to be achieved through exclusive recourse to the federal system of military death and disability benefits." *Id.* at 1049. These "three broad considerations . . . permeate the process of assessing whether the totality of the germane facts giving rise to a service member's claim occurred within the purview of a distinctly military sphere of activity or while a military relationship was in effect." *Wake v. United States*, 89 F.3d 53, 57–58 (2d Cir. 1996) (first citing *Taber*, 67 F.3d at 1049; then citing *Sanchez v. United States*, 878 F.2d 633, 634 (2d Cir. 1989); and then citing *Bozeman v. United States*, 780 F.2d 198, 200–01 (2d Cir. 1985)).

In *Wake*, the Second Circuit established a list of non-dispositive factors that courts should consider in examining whether a service member's injuries occurred incident to military service. *Wake*, 89 F.3d at 58. These factors include the relationship of the activity to the individual's membership in the service, the location of the conduct giving rise to the underlying tort claim, whether the activity was limited to military personnel, and whether the service member was taking advantage of a privilege or enjoying a benefit conferred as a result of military service. *Id.* The plaintiff in *Wake* was a naval reserve student who was injured in an automobile accident while returning from a naval hospital. *Id.* At the time of the accident, the plaintiff was a third-year college student and member of the Navy Reserve Officers Training corps (the

"NROTC"). *Id.* at 56. She was also an enlisted, inactive member of the Navy Reserves, subject to reactivation if she withdrew from the NROTC, and training to be an officer in the Navy. *Id.* At the time of the incident, she was traveling as a passenger along with other NROTC students in a vehicle owned by the NROTC program at her college and driven by a Marine Corps Sergeant. *Id.* The accident took place as the plaintiff and other students were returning from a naval air station clinic, where they had gone for physical examinations pursuant to a temporary travel order and authorization from the Commanding Officer of their NROTC unit. *Id.* Because of the plaintiff's previous service in the Navy, she received disability benefits and free medical care from the Department of Veterans Affairs (the "VA") when the VA determined that her injury occurred "while on active duty for training status." *Id.* The plaintiff filed a claim for federal workers' compensation under the Federal Employee Compensation Act ("FECA"), 5 U.S.C. §§ 8101 *et seq.*, and was awarded compensation, but later appealed to overturn her award when she learned that her FECA benefits barred her from proceeding under the FTCA. *Id.*

In deciding whether the *Feres* doctrine barred the plaintiff in *Wake* from recovering for damages sustained as a result of her injury, the Second Circuit focused on the nature of the plaintiff's activity at the time of her injury, rather than her military affiliation. *Id.* at 61 ("It is clear that the nature of the activity, and not the official duty status of the serviceperson, may be determinative of whether or not an activity is 'incident to service.'"); *see also Taber*, 67 F.3d at 1050 (concluding that "in assessing whether a military plaintiff's FTCA claim is barred, the court should proceed by considering [whether the plaintiff was] engaged in activities that fell within the scope of the plaintiff's military employment"). The Court noted that the plaintiff was traveling in a Navy-owned vehicle at the time of her injury, was being driven by a non-commissioned officer acting within the scope of his military employment, was with other

cadets at the time of her injuries, was being transported back to university from a physical examination performed at a Navy base and was taking the trip because she was issued a travel order assigning her to temporary duty and authorizing her travel. *Wake*, 89 F.3d at 57–58. More importantly, the Court emphasized that denying the plaintiff recovery was consistent with the motivations underlying *Feres*, noting that the plaintiff's claim "[fell] squarely within the three rationales for the invocation of the *Feres* doctrine." *Id.* at 61.

Here, Defendant argues that like the plaintiff in *Wake*, Rabbi Kloner, despite his civilian status, was "acting in his military capacity at the time of the accident" primarily because he "was dressed in an official naval uniform and was providing religious services pursuant to his military duties and contract with USCG." (Def. Mem. 22 (quoting *Wake*, 89 F.3d at 59).) The Court is not persuaded by Defendant's argument.

Unlike the plaintiff in *Wake*, and contrary to Defendant's assertion, Rabbi Kloner was not injured "in the course of activity incident to [military] service." *See Feres*, 340 U.S. at 146. Rabbi Kloner served in the Navy and the Naval Reserves for over thirty years, retiring in 1988. (Compl. ¶ 8.) At the time of the Rabbi's injury, he was a part-time civilian contractor being paid approximately $10,000 per year to provide Jewish worship services at military events. (Def. 56.1 ¶ 9.) Although the parties dispute whether Rabbi Kloner attended the USCG retirement ceremony pursuant to his contract with the USCG, (*see* Def. Mem. 22; Pl. Mem. 22), that dispute is immaterial to the Court's determination. Even as a "contract rabbi," (Def. Mem. 22), Rabbi Kloner was contracted by the USCG to perform certain enumerated tasks, but he was not a member of the USCG. While the Rabbi had served the Navy and Coast Guard for his entire adult life, his affiliation with the USCG on June 24, 2010 was fundamentally different from that of a service member, a reservist, or a cadet — that is, it was not "at its very essence a military

relationship." *See Wake*, 89 F.3d at 59. Similarly, regardless of the Rabbi's motivations for wearing a formal military uniform, (*see* Pl. Mem. 21–22), his attire reflected little about the nature of his then-relationship to the USCG or the activity in which he was engaged during his accident.

As Defendant correctly notes, a lack of formal military status is not dispositive in a *Feres* inquiry. (Def. Mem. 21.) More significant is "the nature of the activity," which "may be determinative of whether or not [the plaintiff was injured] incident to service." *Wake*, 89 F.3d at 61 (internal quotations omitted). In considering the *Wake* factors, the balance weighs in favor of waiving immunity under the FTCA. Snug Harbor is not a military-owned space, (Def. 56.1 ¶ 2), and Rabbi Kloner was not attending the ceremony solely by virtue of his military affiliation. *See Wake*, 89 F.3d at 59 ("What is significant is that [the plaintiff] . . . was only authorized to be a passenger in the . . . van due to her affiliation with the Navy."). Nor was Rabbi Kloner "taking advantage of a privilege or enjoying a benefit conferred as a result of military service." *See id.* (citing out-of-circuit cases in which claims originating at military clubs and bases were barred from FTCA recovery). In fact, Rabbi Kloner was not considered part of the ceremony's "Official Party," all of whose members were invited to dress rehearsals and were provided formal escorts. (*See* April Statement 1; Schnetzler Statement 1.)

Moreover, the principles underpinning *Feres* do not compel the Court to bar recovery in this suit. First, an award in Plaintiffs' favor would not implicate "delicate questions involving military discipline." *See Taber*, 67 F.3d at 1049. There is no evidence of any disciplinary relationship between the USCG and Rabbi Kloner either at the time of the accident or since. Although it stands to reason that the USCG maintains a disciplinary relationship with respect to Commander April or Matos, the Second Circuit has stated that "the disciplinary relationship

between the government and a military tortfeasor is usually irrelevant" in *Feres* inquiries. *Taber*, 67 F.3d at 1053; *see id*. at 1047 ("It is difficult to see how FTCA damage awards can, except in the rarest of cases, interfere with a disciplinary relationship between the government and the military tortfeasor.").  In addition, Defendant has suggested no alternative recourse for Rabbi Kloner under the terms of his purported military relationship with Defendant, therefore permitting suit against the government here does not implicate the federal scheme of benefits available to injured service members. *See Wake*, 89 F.3d at 62 (noting that the plaintiff received monthly service-connected compensation benefits as a result of her injury).

The rationales for *Feres* are inapplicable to this case.  Rabbi Kloner's accident had "nothing to do with" his military career and was "not caused by service except in the sense that all human events depend on what has already transpired." *See Taber*, 67 F.3d at 1051 (quoting *Brooks*, 337 U.S. at 52).  Accordingly, the *Feres* doctrine does not deprive the Court of jurisdiction over Plaintiffs' claims.

### c. Plaintiffs' negligence claim

Defendant argues that summary judgment is appropriate because the USCG did not owe a cognizable duty of care to Plaintiffs and that, even if it did owe such a duty, Rabbi Kloner "severed the nexus between the alleged breach of duty and his purported damages" when he chose to climb the staircase without Matos' aid.  (Def. Reply 2.)  Plaintiffs contend that the USCG negligently failed to take a number of precautions that would have prevented Rabbi Kloner's accident — in particular, installing temporary guardrails to the main staircase, stationing a person at the stage to assist the elderly clergy in climbing the stairs, or using the alternate stairways to the right and left of the stage.  (Pl. Mem. 17–19.)  Because a reasonable jury could find that the USCG breached an assumed duty to Rabbi Kloner, the Court denies

Defendant's motion for summary judgment.

To establish a prima facie case of negligence under New York law,[7] a plaintiff must show: (1) that the defendant owed the plaintiff a duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damages substantially as a result of that breach. *Pasternack v. Lab. Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir.) (citing *Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002)), *as amended* (Nov. 23, 2015); *see also Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 17 N.Y.3d 565, 576 (2011) ("To establish a cause of action sounding in negligence, a plaintiff must establish the existence of a duty on defendant's part to plaintiff, breach of the duty and damages." (citing *Akins v. Glens Falls City School Dist.*, 53 N.Y.2d 325, 333 (1981))). "If one of these essential elements is absent from [the] plaintiffs' case, as a matter of law, then the rest of the plaintiffs' case is immaterial, and summary judgment for the defendants is appropriate." *Giuffra v. Vantage Travel Serv., Inc.*, No. 13-CV-6880, 2015 WL 3457246, at *4 (S.D.N.Y. June 1, 2015) (internal quotations omitted) (quoting *Carley v. Theater Dev. Fund*, 22 F. Supp. 2d 224, 227 (S.D.N.Y. 1998)); *see also Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 51 (2d Cir. 2015) (affirming summary judgment for the defendant where the plaintiff had not provided "sufficient evidence to support a link between his injuries and alleged theory of causation"); *Aegis Ins. Servs., Inc., v. 7 World Trade Co., L.P.*, 737 F.3d 166, 178 (2d Cir. 2013) (finding that the defendant owed a duty of care, but holding for the defendant because "[o]nce a duty is established, to prevail [the plaintiff] must prove a breach of that duty, and that the breach was the cause of [the plaintiff's] injuries").

---

[7] Under the FTCA, the liability of the United States to a plaintiff for negligence is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *see also Vidro v. United States*, 720 F.3d 148, 150 (2d Cir. 2013). Neither party disputes that New York law applies to Plaintiffs' negligence claim.

### i. Duty

The parties agree that the USCG did not owe Plaintiffs a duty of reasonable care arising from the USCG's use of the Snug Harbor facility or creation of a dangerous condition. (Pl. Mem. 12; Def. Reply 2.) Plaintiffs instead assert that the USCG assumed a duty of reasonable care to Rabbi Kloner when it (1) assigned Matos to escort him to the stage via the main stairway, and (2) instituted the ORM policy, which required the USCG to detect hazards, assess risks, and institute risk controls at events like the retirement ceremony. (Pl. Mem. 13.) Defendant argues that it did not assume a duty of care toward Rabbi Kloner. (Def. Reply 8.)

A defendant owes an assumed duty of care when his or her conduct places the plaintiff "in a more vulnerable position than he would have been in had [the defendant] never taken any action at all." *Tavarez v. Lelakis*, 143 F.3d 744, 746–47 (2d Cir. 1998) (internal quotation marks omitted) (quoting *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 522 (1980)); *see also Kurzweg v. Hotel St. Regis Corp.*, 309 F.2d 746, 747 (2d Cir. 1962) (holding that even though the defendant hotel was under no duty to furnish a doorman, where a landowner, "under no duty to act . . . voluntarily undertakes to act and causes injury through his negligent act or failure to act," he may be liable under New York law). Explained differently, "[t]he query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good." *H.R. Moch Co.*, 247 N.Y. at 168. The rationale for the assumption-of-duty doctrine was articulated by Justice Cardozo in 1928: "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully if he acts at all." *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 273 (E.D.N.Y. 2014) (quoting *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 167 (1928)).

An assumed duty arises "only where (1) the failure to exercise due care increases the risk of harm to the plaintiff or (2) the harm is suffered because of the plaintiff's reliance on the undertaking." *Tavarez*, 143 F.3d at 747 (quoting Restatement (Second) Torts § 323 at 137 cmt. C (1965)); *see also Heard v. City of N.Y.*, 82 N.Y.2d 66, 73 (1993) (relying on Restatement formulation). Although "the definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make," *Palka v. Servicemaster*, 83 N.Y.2d 579, 585 (1994), the assumption-of-duty inquiry is necessarily fact-specific and typically hinges on a plaintiff's reasonable reliance, to his or her own detriment, as an indicator of whether the defendant has "launched a force or instrument of harm," *H.R. Moch Co.*, 247 N.Y. at 168; *see also Heard*, 82 N.Y.2d at 67 ("[The] [d]efendant must have imparted the information under circumstances and in such a way that it would be reasonable to believe [the] plaintiff will rely upon it; [the] plaintiff must rely upon it in the reasonable belief that such reliance is warranted.")

Thus, where there is evidence that a defendant's continued conduct either placed a plaintiff in a more vulnerable position or caused the plaintiff to detrimentally rely on the defendant, courts have found the question of duty to involve triable issues of fact. *See, e.g.*, *Kievman v. Philip*, 924 N.Y.S.2d 112, 114 (App. Div. 2011) (holding that the plaintiffs "raised triable issues of fact as to whether they relied to any degree upon [defendant] bus driver's wave," which directed the plaintiff mother to cross the road with her children, "and whether his alleged wave placed the infant plaintiff in a more vulnerable position than she would have been had the bus driver done nothing"); *Demshick v. Cmty. Housing Mgmt. Corp.*, 824 N.Y.S.2d 166, 169 (App. Div. 2006) ("There exists a triable issue of fact as to whether the maintenance person directed the plaintiff to move her car prior to the walkways being cleared of snow, and thus

whether [the defendant], by the maintenance person's alleged actions, breached its duty of care . . . by placing the plaintiff in a more vulnerable position than if he had done nothing."); *Cohen v. Heritage Motor Tours*, 618 N.Y.S.2d 387, 389 (App. Div. 1994) (denying summary judgment because the plaintiff's evidence that her tour guide directed her to cross slippery stones "raise[d] a sufficient factual question as to whether [the defendant] owed . . . a duty and exercised reasonable care under the circumstances"); *cf. Florence v. Goldberg*, 44 N.Y.2d 189, 194 (1978) (holding as a matter of law that police department assumed a duty to supervise school crossings because departmental regulations mandated such supervision and because the plaintiff relied on that supervision in deciding whether to let her child travel to school alone); *Gordon v. Muchnick*, 579 N.Y.S.2d 745, 746 (App. Div. 1992) (holding as a matter of law that the defendant had assumed a duty of care where he guided the plaintiff across the street, arm-in-arm, before the plaintiff was hit by a car, and where the plaintiff "had relied on the defendant . . . [and] was more cautious when she crossed the street alone").

Where there is no evidence that a defendant's actions either placed the plaintiff in a more vulnerable position or caused the plaintiff to detrimentally rely on the defendant, courts have held as a matter of law that the defendant did not assume a duty of care. *See, e.g.*, *Tavarez*, 143 F.3d at 747 (holding that "[t]here was no evidence that [the defendant] left [the plaintiff] in an unreasonably precarious position, or otherwise exposed [her] to an unreasonable risk of harm"); *Sang Lan v. Time Warner, Inc.*, No. 11-CV-2870, 2014 WL 764250, at *3–4 (S.D.N.Y. Feb. 25, 2014) (holding that the defendant "had not placed [the plaintiff] in a more dangerous position than she would have been had it failed to act" because it neither "prevented [the plaintiff] from engaging in any course of conduct that was available to her prior to [the defendant's] intervention" nor foreclosed the plaintiff's alternative option); *Suthers*, 441 F. Supp. 2d at 490

(holding that defendant pharmaceutical manufacturer did not assume a duty to continue supplying experimental drug to drug study participants where withdrawal of the drug simply resulted in continuation of participants' malady at prior levels); *Hong Wu v. Dunkin' Donuts, Inc.*, 105 F. Supp. 2d 83, 95 (E.D.N.Y. 2000) (holding that "[s]ince the record is barren of evidence demonstrating reliance, plaintiffs' claim based on a voluntary assumption of duty fails"), *aff'd*, 4 F. App'x 82, 83 (2d Cir. 2001); *Heard*, 82 N.Y.2d at 73 (holding after trial that the complaint should have been dismissed because the plaintiff "was in no worse position once the [defendant] lifeguard acquiesced in his dive than if the lifeguard had stood by and done nothing"); *Wilson v. Hyatt Corp.*, 900 N.Y.S.2d 325, 327–28 (App. Div. 2010) (granting summary judgment for the defendant where the plaintiff did not contend that she relied to her detriment upon defendant contractors having cleaned snow from the hotel entry where the plaintiff fell).

### 1. Assumption of duty — Matos

Plaintiffs argue that Matos "assumed a duty of reasonable care for the safety of Rabbi Kloner when she greeted him and undertook to show him to the seat as 'the one in charge' to go with him up to the stage." (Pl. Mem. 13 (quoting Pl. 56.1 ¶ 58).) To support their argument, Plaintiffs rely on *Cohen v. Heritage Motor Tours, Inc.*, in which a tour participant was injured when the tour guide directed her to cross the stepping stones of a brook. *Cohen*, 618 N.Y.S.2d 387, 388 (App. Div. 1994). Acknowledging that the tour company had no general duty to the plaintiff, the court nevertheless found that because the tour guide "directed the tour participants to follow her across the stones," and the participants claimed that they "relied on her to guide them," the tour guide had assumed a duty to exercise reasonable care. *Id.* at 389.

Defendant argues that *Cohen* is inapposite because "Matos did not direct Rabbi Kloner to

walk up the stage staircase by himself, nor did [] Matos inform Rabbi Kloner that the safest route to the stage was the stage staircase." (Def. Reply 7.) Defendant cites two cases to support this argument. (*Id.* at 7–8 (first citing *Giuffra v. Vantage Travel Serv., Inc.*, No. 13-CV-6880, 2015 WL 3457246, at *4 (S.D.N.Y. June 1, 2015); and then citing *Carley v. Theater Dev. Fund.*, 22 F. Supp. 2d 224, 229 (S.D.N.Y. 1998)).) In *Giuffra*, the plaintiffs were experienced travelers who were mugged and assaulted in an enclosed pedestrian passageway while returning from dinner on a European trip. *Giuffra*, 2015 WL 3457246, at *1. The plaintiffs had purchased a prepackaged tour from the defendant and alleged that the defendant had a duty to investigate and warn the plaintiffs that the pedestrian passageway near the hotel was unsafe. *Id.* In deciding *Giuffra*, the court distinguished *Cohen*, noting that "there is no evidence that [the defendant] or its employees directed [the] plaintiffs" to take the path that they did while returning from dinner, or that the defendants otherwise assumed a duty as to the plaintiffs' safety. *Id.* at *4. In fact, the plaintiffs "had received at least two documents from [the defendant] expressly *disclaiming* any such duty." *Id.* Similarly in *Carley*, the defendant tour operator arranged hotel accommodations for plaintiff tourists, who were subsequently injured at the hotel. *Carley*, 22 F. Supp. 2d at 225. The court in *Carley* distinguished *Cohen* by noting that the defendant's role in *Carley* "was much more general, merely acting to facilitate the tour participants' enjoyment of the tour, not specifically directing the plaintiffs on how to conduct themselves throughout the trip." *Id.* at 229. The court emphasized that there was "no evidence that the plaintiff in *Cohen* was given the extensive statement disclaiming liability that the plaintiff was in this case." *Id.* Thus, "in *Cohen* a reasonable person might believe that the tour guide was taking full responsibility for the safety of the stepping stones." *Id.*

In the absence of perfectly analogous circumstances, the Court agrees that the cited cases

are instructive because they involve third-party tour operators or guides on properties they neither own nor occupy regularly but with which they are more familiar than their patrons. In such instances, "where the [third party] assumes a duty to the plaintiff, such as where one of its employees directs the [] participant to 'proceed in a particular manner,' the [third party] may be held liable if its conduct placed the plaintiff in a more vulnerable position." *Maraia v. Church of Our Lady of Mt. Carmel*, 828 N.Y.S.2d 525, 526 (App. Div. 2007) (quoting *Cohen*, 618 N.Y.S.2d at 387); *see Wolf v. City of N.Y.*, 39 N.Y.2d 568, 573 (1976) (affirming jury decision that a defendant lieutenant firefighter assumed a duty when he ordered the plaintiff, a volunteer, off an unfamiliar roof unaccompanied and "pointed to a direction to get off the roof"); *cf. Mongello v. Davos Ski Resort*, 638 N.Y.S.2d 166, 167 (App. Div. 1996) ("The plaintiff's reliance on [*Cohen*] is misplaced inasmuch as she does not allege that the [defendant] directed the decedent to ski down the slope where the accident occurred.").

Here, although the material facts are undisputed, the Court cannot decide as a matter of law whether Defendant assumed a duty of care to Plaintiffs when Matos greeted Rabbi Kloner and directed him up the main staircase to the stage. (Def. 56.1 ¶ 11, 15.)

Defendant argues that Matos did not "direct Rabbi Kloner to walk up the stage staircase by himself, nor did [she] inform Rabbi Kloner that the safest route to the stage was the stage staircase." (Def. Reply 7.) Neither, however, did the defendant in *Cohen* inform the plaintiff that the stepping stone path over the river was the safest route available. *Cohen*, 618 N.Y.S. at 389. Nevertheless, the tour guide in *Cohen* "allegedly directed the participants to proceed in a particular manner," which sufficed to create a triable issue of fact as to his employer's duty. *Id.* ("If [the guide] directed the tour participants to follow her across the stones, she assumed a duty to exercise reasonable care since it is claimed that tour participants relied on her to guide

them.").  A reasonable jury could conclude that, like the plaintiff in *Cohen* who had relied on her

tour guide until the tour group reached the stepping stone path and who was told nothing of an

alternate path once there, *id.* at 388, Rabbi Kloner was "directed . . . to proceed in a particular

manner" to the stage, *id.*, and that in being so directed, the Rabbi was "placed . . . in a more

vulnerable position," *Maraia*, 828 N.Y.S.2d at 526, than had he been compelled to find his own

route to the stage, *see Wolf*, 39 N.Y.2d at 573; *Mongello*, 638 N.Y.S.2d at 167.  Because a

genuine issue of fact exists where there is sufficient "evidence on which the jury could

reasonably find for the plaintiff," *Anderson*, 477 U.S. at 252, Defendant's duty to Rabbi Kloner

is a genuine issue of fact for a jury, *see Cohen*, 618 N.Y.S.2d at 390 ("If the tour guide did not

direct the plaintiff to traverse the stepping stones, there would be no duty attributable to the

defendant.  The duty arises if [the tour guide] acted as the plaintiff claims.").

### 2.    Assumption of duty — ORM manual

Plaintiffs argue that the USCG also assumed a duty of care when it instituted the ORM

manual and process.  (Pl. Mem. 13.)  Because Matos' conduct creates a genuine issue of fact as

to Defendant's duty, the Court declines to reach the parties' arguments regarding the ORM

manual and process.

### ii.    Breach and proximate cause

Defendant argues that even if it assumed a duty of care toward Rabbi Kloner, it did not

breach its duty because it was not permitted to install guardrails, it was not required to station a

person at the staircase when it had provided Rabbi Kloner with an escort, and it was not required

to use alternate staircases because the main staircase was not inherently dangerous.  (Def. Mem.

14.)  Defendant further argues that Rabbi Kloner's own conduct was the sole proximate cause of

his accident because he "consciously decided not to wait for [] Matos and instead assumed the

risk of walking up the staircase alone." (Def. Reply 9.) Plaintiffs contend that Defendant breached its assumed duty of care when it "guid[ed] and direct[ed] Rabbi Kloner to use the dangerous pathway to the stage over stairs where no handrails or guardrails were installed and where no person was stationed, instead of the safer option of using the enclosed stairs at the side of the stage . . . ." (Pl. Mem. 18–19.)

"[C]ourts have held that gratuitous conduct may give rise to liability only when the defendant's affirmative action adversely affected the plaintiff and the defendant failed to act reasonably." *Gordon*, 579 N.Y.S.2d at 746. Although ordinarily the question of breach follows from duty, the assumption-of-duty inquiry is one in which "[p]aradoxically . . . the question of whether the defendant *breached* a duty may be determinative of whether . . . there arose an actionable duty in the first instance." *Doona v. OneSource Holdings, Inc.*, 680 F. Supp. 2d 394, 402 (E.D.N.Y. 2010); *see Van Hove v. Baker Commodities, Inc.*, 732 N.Y.S.2d 803, 804 (App. Div. 2001) ("A defendant who voluntarily assumes a duty to act with reasonable care toward others may be held liable for breach of that duty if the plaintiff relied on the defendant's undertaking and if the defendant's act or failure to act placed the plaintiff in a more vulnerable position than if the obligation had not been assumed." (first citing *Heard*, 82 N.Y.2d at 72; then citing *Nallan*, 50 N.Y.2d at 522; and then citing *Cohen*, 618 N.Y.S.2d 387)); *see also Sang Lan*, 2014 WL 764250, at *3–4 (holding that the plaintiff "ha[d] not stated a cause of action for violation of an assumed duty" because she had neither "pleaded facts that could establish her reliance on [the defendant's] conduct was reasonable" nor articulated how the defendant had placed her "in a more vulnerable position than if it had done nothing").

Thus, in New York, a breach is necessarily implied where a defendant is found to have assumed a duty of care. *See Espinal v. Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 141–42

(2002) (explaining that liability may lie when a defendant "launch[es] a force or instrument of harm" only if that defendant "undertakes to render services and then negligently creates or exacerbates a dangerous condition"); *see also Tavarez*, 143 F.3d at 747 (considering breach as part of the assumption of duty); *Crum & Forster Specialty Co. v. Safety Fire Sprinkler Corp.*, 405 F. Supp. 2d 223, 227–28 (considering breach as part of the assumption of duty); Restatement (Second) Torts § 323 at 137 (noting that assumed duty attaches where "the actual danger of harm to the other has been increased by the partial performance, or . . . the other, in reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance").

The same holds true for proximate cause, a prong of common-law negligence that is impliedly subsumed within the assumption-of-duty analysis.[8] If the defendant's action did not proximately cause the plaintiff's injury, it cannot be said that "(1) the [defendant's] failure to exercise due care increase[d] the risk of harm to the plaintiff or (2) the harm [was] suffered because of the plaintiff's reliance on the undertaking." *Tavarez*, 143 F.3d at 737; *see also Heard*, 82 N.Y.2d at 72 ("It is not enough for [the] plaintiffs to say that [the] defendant could have prevented [the injurious conduct] by withholding permission. The issue is causality — in short, not what [the] defendant could have prevented but what [the] defendant proximately caused by inducing reliance."); *Giuffra*, 2015 WL 3457246, at *4 (holding that the defendant

---

[8] Defendant's argument regarding the assumption of risk conflates the doctrine of primary assumption of risk and the element of proximate cause. (*See* Def. Reply 9.) To the extent that Defendant argues that Rabbi Kloner assumed the risk of his fall because he voluntarily climbed the stairs without Matos, that argument is unavailing in New York except in limited cases involving an elevated risk of danger. *See Cohen v. Heritage Motor Tours, Inc.*, 618 N.Y.S.2d 387, 389 (App. Div. 1994) (noting the inapplicability of the primary assumption of risk doctrine since the advent of comparative negligence law in New York). Defendant presents no authority to the contrary.

assumed no duty in part because of superseding causes of injury); *Carley*, 22 F. Supp. 2d at 229 (finding that "the operation of an independent contractor hotel is a service over which a reasonably prudent person would not expect his or her tour operator to have control").

On the evidence before the Court, a reasonable jury could find that the USCG assumed and breached a duty of care to Rabbi Kloner, which resulted in his injury. Accordingly, the Court denies Defendant's motion.

### d. Mrs. Kloner's damages claim

Defendant argues that Mrs. Kloner's claims for medical and other expenses fail as a matter of law because they are derivative of Rabbi Kloner's inadequate claims. (Def. Mem. 23.) Derivative claims, such as those for loss of consortium, cannot exist "independent of the injured spouse's right to maintain an action for injuries sustained." *Bertini v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 246, 260 (E.D.N.Y. 2014); *see also Wright v. City of Ithaca*, 633 F. App'x 63, 66 (2d Cir. 2016) (holding that a wife's "derivative claim must fall with her husband's principal claims" (citing *Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996))); *Rodriguez v. Athenium House Corp.*, 557 F. App'x 37, 40 n.1 (2d Cir. 2014) ("Because [the plaintiff wife's] claim for loss of consortium is entirely derivative of her husband's negligence claim, our resolution of this appeal as to [the plaintiff husband] applies equally to [his wife]."). Defendant provides no further argument for dismissing Mrs. Kloner's claims. Accordingly, Mrs. Kloner's claims survive until the issue of liability is decided on the principal claim.

### III. Conclusion

For the foregoing reasons, the Court denies Defendant's motion for summary judgment.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: July 21, 2016
      Brooklyn, New York